UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

BAYOU STEEL, ET AL.                    *        CIVIL ACTION

versus                                 *        NO. 07-1034

EVANSTON INSURANCE CO., ET AL.         *        SECTION "F"

ORDER AND REASONS

Before the Court are several cross-motions:  (1) plaintiffs' motion for summary judgment; (2) motion for summary judgment by Evanston Insurance Co.; and (3) National Union Fire Insurance Company of Pittsburgh's motion.  For the reasons that follow, the plaintiffs' motion is DENIED, and the defendants' motions are GRANTED.

Background

This is a lawsuit for declaratory judgment given life by an insurance coverage dispute.  Bayou Steel Corporation and its excess wharfinger insurer, New York Marine and General Insurance Company (NYMAGIC), seek recovery from the general liability insurer, Evanston Insurance Company, and the excess insurer, National Union Fire Insurance Company of Pittsburgh, for amounts Bayou Steel and NYMAGIC paid in the defense and settlement of a personal injury lawsuit brought against Bayou Steel arising out of an October 2, 2002 accident.

The parties have stipulated to the underlying facts as

1

follows:

The tort suit arose out of personal injuries claimed by Ryan Campbell on October 2, 2002, while he was unloading steel bundles, owned by Bayou Steel, from a barge owned by Memco Barge Lines, Inc. Bayou Steel had contracted with Memco in January 2002 for Memco's carriage of steel cargo from Bayou Steel's facility in LaPlace, Louisiana to various sites.

In August 2002, Bayou Steel loaded a Memco barge with steel angle iron bundles at its facility in LaPlace, Louisiana on the Mississippi River.  Pursuant to its freight contract with Bayou Steel, Memco then towed the loaded barge to Bayou Steel's facility on the Calumet River.  Once the barge reached Chicago, Bayou Steel contracted with Kindra Marine Terminal, Inc., a stevedoring company, to unload the barge.

On October 2, 2002, Ryan Campbell, a Kindra Marine longshore employee, was unloading the steel cargo and was injured when he stepped on a piece of dunnage separating bundles of steel in the hold of the barge and fell.  Campbell was seriously hurt by falling steel.

On November 26, 2002, Mr. Campbell sued Bayou Steel and Stuart Campbell (a foreman employed by Bayou Steel) in Illinois state court.  On September 21, 2004, he amended his complaint, naming Memco and asserting claims under the LHWCA.

At the time of the accident, Bayou Steel had the following

insurance:

    1.   A primary general liability policy issued by Evanston Insurance Company with limits of $1,000,000;

    2.   A commercial umbrella liability policy issued by National Union Fire Insurance Company of Pittsburgh (NUFICPA) with limits of $25,000,000;

    3.   A primary wharfinger liability policy issued by National Union Fire Insurance Company of Louisiana (NUFICLA), with "wasting" limits of $1,000,000; and

    4.   An excess wharfing liability policy issued by new York Marine and General Insurance Company with limits of $14,000,000.

National Union Fire Insurance Company of Louisiana, which issued a $1 million primary wharfinger policy to Bayou Steel, accepted coverage and defense for the claim against Bayou Steel. NYMAGIC had issued a $14 million excess wharfinger policy to Bayou Steel. (NYMAGIC denied coverage but ultimately participated in and contributed to the settlement of the underlying claim).

Evanston Insurance Company (Bayou Steel's commercial general liability insurer) and NUFIC-PA (Bayou Steel's commercial umbrella carrier) denied coverage of the claim, relying, in part on the policies' watercraft and LHWCA exclusions and did not participate in the settlement of the tort suit.

Campbell's tort suit was settled for $6 million, of which $4 million was paid by or on behalf of Bayou Steel as follows: NYMAGIC - $3,414,841.76; and NUFIC-LA - $585,158.74 (and is not seeking reimbursement). Bayou Steel contends that it paid out $71,632.58 in unreimbursed fees and expenses in connection with its defense of the lawsuit.

3

The settlement agreement was executed in Illinois. Claims against NUFIC-LA and NYMAGIC were released, and Bayou Steel and NYMAGIC reserved their right to seek contribution or recovery against Evanston and NUFIC-PA.[1]

On February 21, 2007, Bayou Steel and NYMAGIC filed this suit against Evanston and NUFIC-PA, seeking a declaration of coverage under the respective policies and reimbursement of the payments made to settle the Campbell suit, and, finally, asserting entitlement to statutory penalties for wrongful denial of coverage.

Evanston and NUFIC-PA filed separate motions for summary judgment. Both companies seek summary relief declaring that their policies exclude coverage for Campbell's injuries. They invoke Evanston's watercraft exclusion and the LHWCA exclusion. (NUFIC-PA advances the additional argument that NYMAGIC voluntarily paid to settle Campbell's underlying claim and is, therefore, not entitled to be subrogated to Bayou Steel's claims against Evanston and NUFIC-PA).

The plaintiffs add their own application for summary relief, responding: (1) the watercraft, compensation and LHWCA exclusions in the Evanston and NUFIC-PA polices are inapplicable; (2) there is coverage under the Evanston policy and, because the NUFIC-PA policy

---

[1] Bayou Steel -- in exchange for NYMAGIC's funding of the major portion of Bayou Steel's settlement with Campbell -- purported to assign its rights to recover to NYMAGIC (to the extent of NYMAGIC's payment) against Bayou Steel's primary and umbrella general liability insurers.

follows the form of the Evanston policy, there is coverage under both policies; and (3) Evanston's denial of coverage under the CGL policy it issued to Bayou Steel amounted to bad faith, subjecting it to penalties under La.R.S. 22:658 and/or 22:1220.

## I. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving

party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987).  Finally, in evaluating the summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

II.

A.  Choice of Law:  Louisiana law governs the interpretation of the policies.

In a diversity case, federal courts apply the choice of law principles of the forum state.  Klason Co. v. Stentor Elec. Mfc. Co., Inc., 313 U.S. 487, 496 (1941). The parties do not dispute that Louisiana law applies to this lawsuit. Bayou Steel is a Louisiana corporation, and the only state with any interest in the resolution of this coverage dispute is Louisiana. Louisiana law clearly governs the interpretation of the policies.  See La. Civ. Code art. 3315 and La. Civ. Code art. 3537; see also United Fire and Cas. Co. v. Hixson Brothers, Inc., 453 F.3d 283, 285 (5th Cir. 2006) (law of the state in which policy is delivered governs).

B.  Insurance Policy Interpretation

Interpretation of an insurance policy generally involves a

6

question of law that can be resolved by summary judgment. <u>See</u> <u>Huggins v. Gerry Lane Enterprises, Inc.</u>, 957 So.2d 127, 129 (La. 2007) (citation omitted).

Louisiana law declares that an insurance policy is like any other contract and should be construed according to the general rules of contract interpretation set forth in the Civil Code. <u>See</u> <u>Cadwallader v. Allstate Ins. Co.</u>, 848 So.2d 577, 580 (La. 2003). The Court's role in interpreting contracts is to determine the common intent of the parties. La. Civ. Code art. 2045. In doing so, Civil Code article 2047 requires that words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. <u>See</u> <u>Henry v. South Louisiana Sugars</u> <u>Cooperative</u>, 957 So.2d 1275, 1277 (La. 2007) (citing <u>Cadwallader v.</u> <u>Allstate Ins. Co.</u>, 848 So.2d 577, 580 (La. 2003)). "When the words of a contract are clear and explicit and lead to no absurd consequences," Civil Code article 2046 declares, "no further interpretation may be made in search of the parties' intent", and the agreement must be enforced as written. <u>Hebert v. Webre</u>, 982 So.2d 770, 773-74 (La. 2008). The Court's approach to a contract's meaning is driven by common sense principles.

Courts should not stretch the text of insurance policies in a strained manner so as to enlarge, or to restrict, policy provisions beyond what is reasonably contemplated by the text or so as to

achieve an absurd conclusion.    Henry v. South Louisiana Sugars Cooperative, 957 So.2d 1275, 1277 (La. 2007) (citation omitted). Absent a conflict with state law or public policy, an insurance contract can limit an insurer's liability and impose and enforce reasonable conditions upon the insurer's obligations.  Id. at 1277-78 (citations omitted).

A policy provision that is susceptible of different meanings must of course be given a meaning that renders it effective; not with one that renders it ineffective.  La. Civ. Code art. 2049. More common sense: the policy should be construed as a whole, and one portion should not be construed separately at the expense of disregarding another.  See La. Civ. Code art. 2050; see also Hebert v. Webre, 982 So.2d 770, 774 (La. 2008) (citations omitted).

Finally, if some ambiguity remains after the Court applies these general rules of construction, the ambiguous contractual provision is construed against the insurer and in favor of coverage.  Id. at 1278 (citing Cadwallader v. Allstate Ins. Co., 848 So.2d 577, 580 (La. 2003)).   Under a rule of strict construction, unclear provisions that seek to narrow an insurer's obligation must be strictly construed against the insurer.  Id. (citing Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co., 630 So.2d 759, 764 (La. 1994) and Garcia v. St. Bernard Parish School Board, 576 So.2d 976, 976 (La. 1991)).  Rules of strict construction apply when the unclear provision can support either of

several reasonable interpretations. <u>Id.</u> (citing <u>Cadwallader v.</u> <u>Allstate Ins. Co.</u>, 848 So.2d at 580).

III.

Mindful of these principles of construction, the Court turns to the Evanston policy to sort out the issue of coverage raised by these motions for summary judgment.

None dispute that Campbell's injuries would be covered by the general coverage section of the Evanston policy, a commercial general liability policy. The policy obligates Evanston to "pay those sums that the Insured becomes legally obligated to pay as damages because of 'bodily injury'. . .to which this insurance applies." Based on this general coverage provision, if Bayou Steel were liable for Campbell's injuries, any amounts that it would have had to pay would be covered under the Evanston policy, unless otherwise excluded.

The issue specific to this case is whether insurance coverage is excluded under either the Watercraft Exclusion or the LHWCA Exclusion.

**A.  The Watercraft Exclusion**

The Evanston policy contains a Watercraft Exclusion:

<u>Watercraft Exclusion</u>: The policy excludes coverage for:

> "Bodily injury" ... arising out of the ownership, maintenance, use or entrustment to others of any ... watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

9

The plaintiffs rely on the Bayou Steel/Memco Freight Contract to suggest that Memco's barge was not "owned or operated by or rented or loaned to" Bayou Steel within the meaning of the Watercraft Exclusion.  Plaintiffs draw attention to Paragraph 24 of the Freight Contract, which provides:

> nothing contained in their Contract shall be construed as a contract by [Bayou Steel] for the chartering, hiring or leasing of any barge ... and that [Bayou Steel] shall exercise no control over the operation of any barge ...

Evanston and NUFIC-PA counter that it is undisputed that Campbell's injuries arose out of the loading and unloading of the barge.  That is their determined focus.  They make the argument that Bayou Steel, while it had possession of the barge, was using and operating the barge, because "use" is defined in the Watercraft Exclusion to include loading and unloading.  They further point to other provisions of the Freight Contract to advance their argument that Bayou Steel operated the barge:

> [12(b)] <u>Loading Requirements</u>.
> Shipper [Bayou Steel] shall load a barge in the maximum draft specified by Carrier [Memco]
> ***
> [12(d)] <u>Possession of the Barge during Loading/Unloading</u>.  Carrier [Memco] shall deliver an empty or loaded barge to a landing designated by [Bayou] ... for loading and unloading. [Bayou] ... shall assume the duty and responsibility for the safety of any barge in their possession.  For the purpose of this section, the term "possession" shall mean the period of the time commencing when Carrier delivers any empty or loaded barge for loading or unloading by [Bayou] ... to any landing

> designated by [Bayou] until the barge is
> removed by Carrier ... [Bayou] ... shall be
> responsible for safekeeping of Carrier's barge
> delivered to a landing regardless of whether
> [Bayou] ... owns or operated the landing.
> ***[Bayou] shall protect and maintain
> necessary lights or any other navigational
> aids on Carrier's barge while at origin and
> destination.
> ***
> [12(e)] <u>Unloading</u>. It shall be the obligation
> of [Bayou] ... to unload and remove the Cargo
> from the barge...
> ***
> [12(f)] <u>Safe Berth</u>. [Bayou] warrants the barge
> shall have a safe berth on not less than nine
> (9) feet of draft...

Bayou Steel urges that the defendants present a strained interpretation in the face of the clear and explicit wording of Paragraph 24. The Court agrees.

A literal reading of the Watercraft Exclusion compels the conclusion that it concerns only the operating or unloading of a watercraft "owned or operated by or rented or loaned to" Bayou Steel. By focusing on whether the insured owns, operates or leases or has been loaned the watercraft, the exclusion goes beyond barring coverage merely because injury occurs on a watercraft; rather, some control or dominion of the watercraft by the insured is required. It is operational control over the barge by Bayou Steel which is precisely what is absent on this record.

It is undisputed that Bayou Steel's subcontractor, not Bayou Steel, was engaged in unloading the barge; it seems also undisputed that the barge was a "watercraft". But, as to defining Bayou

Steel's status as to the barge, it was Memco (and not Bayou Steel) that owned or operated the barge.  Indeed, the clear language of Paragraph 24 of the Freight Contract disclaims any intent by Memco that the barge would be chartered or leased to Bayou Steel, or that at any time Bayou Steel would exercise operational control.  The fact that one provision of the Freight Contract states that Bayou Steel "possesses" the barge during unloading activities, and is responsible for the safety of the barge during that time, is not tantamount to operating or being loaned the watercraft.  Finally, the Court notes that it would seem that the purpose of the exclusion is to bar coverage for those risks that are usually the traditional undertaking of a marine underwriter.  <u>Cf.</u> <u>Grigsby v. Coastal Marine Service of Texas, Inc.</u>, 412 F.2d 1011, 1037 (5th Cir. 1969).[2]

---

[2] The intent of the exclusion, and its focus on ownership and control over the watercraft is made even more clear when considered in light of the exceptions to the exclusion:

  g.  Aircraft, Auto or Watercraft

  "Bodily injury" or "property damage" arising out of the ownership maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

  This exclusion does not apply to:

  (1) A watercraft while ashore on premises you own or rent;
  (2) A watercraft you do not own that is:
     (a) less than 26 feet long; and

The Court's reliance on the language of the Freight Contract to support its finding that the Watercraft Exclusion is not applicable on these facts finds support in a case that construed a similar watercraft exclusion.[3]   For example, Arkwright-Boston Manufacturer's Mutual Ins. Co. v. Comet Rice, Inc., Nos. 88-5282, 89-2067, 1991 WL 111916 (E.D. La. 1991) was a declaratory judgment lawsuit involving a coverage dispute.   Like Campbell, the original personal injury plaintiff was a longshoreman; he was injured unloading bagged rice aboard the M/V VALEA ALBA, an ocean-going bulk carrier which Comet Rice had voyage chartered.   (Comet settled with the injured plaintiff and his employer).   The watercraft exclusion, like the one in Evanston's policy, was a CGL policy that excluded coverage for injury arising out of the "loading or unloading of any watercraft owned or operated by or rented or loaned to any insured."   Id. at *2.   The insurer did not dispute that the M/V VALEA ALBA was not owned, operated by, or loaned to

---

(b) not being used to carry persons or property for a charge....

[3] Cf. Henry v. South Louisiana Sugars Cooperative, 957 So.2d 1275 (La. 2007) (holding, as a matter of first impression, that the barge was not "ashore" on the owner's premises within the meaning of the exception to the watercraft exclusion, and thus the watercraft exclusion unambiguously barred coverage). In Henry, there was no dispute that the dock barge was a watercraft or that the Henry accident arose out of So. La. Sugars' "ownership, maintenance, use or entrustment to others" of the dockbarge because, indeed, So. La. Sugar owned the dock barge. So the only issue for the state supreme court was whether the "ashore" exception to the watercraft exclusion applied.

Comet.   Rather, the insurance company argued that the voyage charter Comet entered into was a "rental" of the watercraft.   The district court disagreed, and determined that, as a matter of law, the water exclusion did not apply to exclude coverage because the voyage charter did not amount to a rental of the watercraft.   Id. Instead, the court determined that the contract was a standard voyage charter party.   Id. at *2-3.   Importantly, the court found that, pursuant to the contract, possession and control of the vessel were retained by the shipowner.[4]   Id. at *2.   Like the voyage charter party, the Freight Contract here was a contract for the carriage of goods, where the shipowner (Memco) maintained control of the watercraft.   Accordingly, the Watercraft Exclusion is inapplicable and coverage cannot be denied on that basis.

### B.   The LHWCA Exclusion

An Evanston policy endorsement contains the following LHWCA Exclusion:

> This insurance does not apply to "Bodily Injury", "Property Damage," "Personal Injury", or "Advertising Injury", imposed upon you or assumed by you under contract with respect to claims made or suits brought against you or any indemnitee pursuant to the "United States Longshoremen & Harbor Workers Compensation Act" (Title 33 USCA, Sections 901-950) including any amendments or revisions thereto.

---

[4] Essentially, Comet had contracted with the shipowners for transportation of a specified cargo on a defined voyage, an arrangement best characterized as a contract of affreightment or a contract for the carriage of goods as opposed to a lease or a rental of a vessel.

It is undisputed that Campbell's tort claim was brought by a longshoreman, who had collected LHWCA benefits because of the longshore incident, and had also asserted negligence claims against Bayou Steel.  It is instructive to recall that, in his amended complaint, Campbell alleged that he was a longshoreman engaged in maritime employment and that he was injured on a vessel in navigable waters.[5]

Based on Campbell's status as a longshoreman and his claims asserted against Bayou Steel, the defendants, drawing all these strands together, contend that the underlying lawsuit could only

_____

[5]  In addition to asserting general allegations of negligence, Campbell alleged that Bayou Steel violated the LHWCA by:

> negligently maintaining and controlling steel angle iron and dunnage; failing to properly load the steel angle iron; negligently re-using dunnage to separate the bundles of steel angle iron; using weakened or rotten dunnage to separate the bundles of steel angle iron; failing to use sufficient amounts of dunnage; failing to warn Campbell that it was safe to step on the dunnage; failing to inspect the barge and its cargo when it arrived at the Bayou Steel facility; failing to warn of a known dangerous condition; failing to have the barge and its contents in a safe condition that would allow Campbell to carry on longshoring operations with reasonable safety; and failing to intervene to remedy a known hazard on the barge likely to be encountered by Campbell.

To plead into the orbit of the LHWCA, Campbell alleged that "Bayou Steel was the owner, owner pro hac vice, agent, operator, and/or charter of the vessel" on which he was injured.

15

have been brought against Bayou Steel "pursuant to" Section 933 or
Section 905(b) of the LHWCA.  They urge the Court to focus on the
"pursuant to" language in the LHWCA Exclusion.  Whether Campbell's
claim was brought against Bayou Steel as the vessel under Section
905(b), or against Bayou Steel as a third-party under Section 933,
in either case Campbell's claim against Bayou Steel was, their
argument goes, logically "pursuant to" either Section 905(b) or
Section 933 of the LHWCA, and coverage is excluded.

The defendants contest the plaintiffs' assertion that, because
Campbell's claim was grounded in negligence under the general
maritime law, that trumps the notion that it was a lawsuit pursuant
to the LHWCA.  Evanston agrees that the Campbell lawsuit against
Bayou Steel was a negligence claim and not a claim for workers'
compensation, but appealingly suggests that this fact merely
bolsters its invocation of the LHWCA Exclusion because -- if it
were a claim for workers' compensation -- coverage for the lawsuit
would be barred by the policy's separate Workers Compensation
Exclusion, which provides:

> d.   Workers Compensation & Similar Laws:
>      [The policy excludes coverage for:]
>
>      Any obligation of the insured under a
>      workers compensation, disability benefits
>      or unemployment compensation law or any
>      similar law.

The Court finds that the LHWCA Exclusion for section 905(b)
and section 933 claims (indeed for any claim made or suit brought

16

pursuant to Title 33 U.S.C. Sections 901-950) is entirely
consistent with the policy's typical exclusion of coverages for
maritime-related claims.[6]

   In Beaumont Rice Mill v. Mid-American Indemnity Ins. Co., 948
F.2d 950 (5th Cir. 1992), a good match here, MAIIC issued an excess
CGL policy to Beaumont.  The plaintiff, a longshoreman who was not
employed by Beaumont, was injured on a barge while unloading rice.
He sued Beaumont in negligence; Beaumont third-partied MAIIC for
coverage.  MAIIC denied coverage, relying on its policy's LHWCA
Exclusion, which provided "[this policy does not apply to] any
losses arising out of injuries covered under the [LHWCA], whether
brought by the injured employee or any third party."  Id. at 951.
Beaumont argued that the MAIIC policy only excluded coverage for
claims by Beaumont's own employees.  Applying Texas law, the Fifth
Circuit determined that the MAIIC policy exclusion was unambiguous
and enforceable.  Id. at 951-52.  In rejecting Beaumont's argument
that because the plaintiff's claim was one in tort it was therefore
not a claim "covered by" the LHWCA, the Fifth Circuit reasoned that

           The legal theory under which an employee
           institutes suit is irrelevant under the plain

────────────────────

           [6] For example, Evanston notes that the policy at issue
also excludes coverage for:
           -    claims arising out of the use of any water craft
                operated or rented or loaned to any insured;
           -    claims under the Jones Act (by endorsement);
           -    claims for bodily injury to employees;
           -    claims for workers' compensation; and
           -    claims made or suits brought pursuant to the LHWCA.

terms of the policy.  The only requirements
for exclusion are that the loss arose out of
the injury and that the injury was covered
under the LHWCA.

Id. at 951.  Beaumont Rice Mill provides convincing reasoning.[7]

---

[7] The plaintiffs point to Parker v. South Louisiana
Contractors, Inc., 537 F.2d 113 (5th Cir. 1976), where a truck
driver who was injured while walking along a steel ramp used to
access a barge brought a suit in negligence against the
owners/lessees of the barge and ramp.  In opposing a motion to
dismiss based on lack of jurisdiction, the plaintiff argued that
his claim was against the vessel owner and brought under the LHWCA;
this, he argued, satisfied the court's original jurisdiction under
Section 1337.  The Fifth Circuit disagreed:

> Since he does not seek relief
> against his employer, the only
> provision of the LHWCA under which
> [plaintiff's] action may even
> arguably be thought to arise is
> section 905(b), governing third
> party actions for negligence. . .
> however, section 905(b) merely
> preserves an injured worker's right
> to recover damages from third
> parties in accordance with
> nonstatutory negligence principles.
> Thus appellant may not convert an
> ordinary tort claim into a federal
> cause of action by invoking a
> statutory provision such as section
> 905(b) as a predicate for section
> 1337 jurisdiction.

Based on this, the plaintiffs assert, "if a negligence action was
brought 'pursuant to' the LHWCA, such a claim would have become a
federal statutory cause of action (necessitating Section 1337
jurisdiction).  Similarly, the plaintiffs say that Judge Schwartz
held in 1988 that the LHWCA preserves to longshoremen their "pre-
existing rights under general maritime law to assert claims for
injury caused by the 'negligence of a vessel.'"  White v. Cooper/T.
Smith Corp., 690 F. Supp. 534 (E.D. La. 1988).  These cases seem
only vaguely appropriate to this case, if at all.  Beaumont Rice
Mill seems the more defining, and later, precedent.

The parties argue persistently about whether Campbell's claims against Bayou Steel are claims for vessel negligence or claims for more universal third-party negligence, to advance or combat whether Campbell's claims arise "pursuant to" the LHWCA.  But metaphysics and alchemy must give way to interpreting the central text of the LHWCA Exclusion, and in the context of the entire policy.  It is to this task that the Court now turns.

Applying the principles governing contract interpretation, the Court finds that the plain, ordinary and literal meaning of the LHWCA Exclusion bars coverage for Campbell's damages.

First, the text itself of the exclusion overcomes coverage for claims made against Bayou Steel pursuant to the LHWCA, Title 33 USCA, Sections 901-950; what triggers the exclusion is clear: a claim made pursuant to some provision of the LHWCA.

While the plaintiffs suggest that "pursuant to" is ambiguous, the Court must first be faithful to the rational meaning of the words.  The Court recognizes the value of the dictionary definition in divining what words rationally mean.  See In re Katrina Canal Breaches Litig., 495 F.3d 191 (5th Cir. 2007).  NUFIC-PA points to the Webster's Dictionary definition of "pursuant to" as "in carrying out; in conformity with; according to."  It is not surprising that other dictionaries offer similar definitions: the Oxford English Dictionary definition of "pursuant" is "in accordance with" and "in conformance to".  The American Heritage

Dictionary of the English Language (4th ed. 2000) similarly defines "pursuant to" as "in accordance with" and "conformable to".[8]

Instructed by dictionary parameters, the Court holds that the LHWCA Exclusion bars coverage for any claims made or suits brought in accordance with the provisions of the LHWCA.  Campbell, a longshoreman who received benefits under the LHWCA, sued Bayou Steel for negligence as a vessel or as a party who was not his employer.  Both substantive claims are driven, informed, and permitted by the LHWCA statutory scheme, or "in accordance with" the statute (as explicitly provided by the exclusion: "Title 33 USCA, Sections 901-950").  Campbell's claim against Bayou Steel falls within the plain reach of the exclusion.  The Court agrees with the defendants that the fact that the claim was for negligent conduct does not remove it from the reach of the LHWCA exclusion. Cf. Beaumont Rice Mill v. Mid-American Indemnity Ins. Co., 948 F.2d 950 (5th Cir. 1992).

Second, the Court's determination that Campbell's claim falls within the scope of the LHWCA Exclusion is reinforced by reading the policy as a whole.  Applying general principles of contract

---

        [8] The Court does not find much assistance in the case literature.  In a different context (interpreting a gas transportation contract), the Fifth Circuit has looked to Webster's New Collegiate Dictionary and Black's Law Dictionary to define "pursuant to" as meaning "in carrying out" or "in the course of carrying out".  See Tennessee Gas Pipeline Co. v. Federal Energy Regulatory Commission, 17 F.3d 98 (5th Cir. 1994).  This Court places a reliance on the same methodology.

interpretation, the Court's construction that Campbell's claims were pursuant to the LHWCA is consistent with other policy provisions.   Rather than construing the LHWCA Exclusion in isolation at the expense of disregarding other provisions, the Court notes that the policy at issue also excludes coverage for claims under the Jones Act, claims for bodily injury to employees, and claims for workers' compensation.   If the Court construed the exclusion, as plaintiffs urge, it would achieve the unacceptable result of disregarding those other provisions.   The fact that the policy has separate exclusions for claims of injured employees and claims for workers' compensation suggests that the LHWCA Exclusion serves a rather direct purpose.   Interpreting the LHWCA Exclusion according to its plain meaning, and sensitive to the policy framework, overcomes the difficulty created by the plaintiffs' interpretation so that the exclusion is neither made redundant (because of the separate workers compensation and similar laws exclusion), nor meaningless (because, by the plaintiffs' reasoning, claims are merely preserved by, and not brought "pursuant to", the LHWCA).

The Court further notes that there is no hint of a conflict with state law or public policy that would condemn an exclusion for LHWCA claims.[9]

---

[9]   The Court believes that the fact that an exclusion could have been worded better does not necessarily make it ambiguous... "[n]or does the fact that other policies have more

Because the LHWCA excludes coverage for claims made against Bayou Steel pursuant to the provisions of the LHWCA, the exclusion must be enforced as written.

Accordingly, Bayou Steel and NYMAGIC's motion for summary judgment is DENIED and Evanston's and NUFIC-PA's motions are GRANTED to the extent they invoke the LHWCA Exclusion.[10]


New Orleans, Louisiana, October 28, 2008.


_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

_____

explicitly defined the scope of similar exclusions." In re Katrina Canal Breaches Litig., 495 F.3d 191, 210 (5th Cir. 2007).  Insurance policies are hardly models of competent draftsmanship.

   [10] Finally, to the extent NUFIC-PA seeks summary judgment declaring that its policy provides excess insurance and Evanston's policy provides primary insurance, the Court finding no dispute in the papers, the request for summary judgment on that issue is GRANTED.